UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

TAYLOR, BEAN & WHITAKER MORTGAGE
CORPORATION, a Florida corporation,

        Plaintiff,

v.                                Case No.  5:05-cv-260-Oc-GRJ

GMAC MORTGAGE CORPORATION, a
Pennsylvania corporation,

        Defendant.
_____

## ORDER

Pending before the Court is Defendant GMAC Mortgage Corporation's Motion To Strike Expert Testimony Of Steven J. Davis And Disqualify Him From Testifying At Trial On Damages Due To The Withholding Of Funds. (Doc. 261.) Plaintiff has filed a response in opposition (Doc. 270) and thus, the matter is ripe for review.[1]  For the reasons discussed below, Defendant's Motion is due to be **DENIED.**

## I. INTRODUCTION

Defendant, GMAC Mortgage Corporation ("GMAC") moves to strike the expert testimony of Steven J. Davis, Ph.D. – Plaintiff, Taylor, Bean &Whitaker Mortgage Corporation's ("TBW") damages expert – and disqualify him from testifying at trial regarding any alleged damages due to the withholding of funds owed TBW.   At issue is Dr. Davis' expert report entitled "On Damages Due To the Withholding of Funds Owed Taylor, Bean & Whitaker Mortgage Corporation" (hereinafter referred to as the "Davis

---

[1] Neither party has requested a Daubert hearing and the Court concludes that a hearing would not be helpful in this case based on the nature of the case and the challenges raised by this motion. See e.g., Corwin v. Walt Disney Co., 475 F.3d 1239, 1252, n. 10 (11th Cir. 2007.)

Report.")[2]  The Davis Report is focused on TBW's allegation that GMAC improperly withheld $8,385,733.97 from the purchase price of the mortgage servicing rights transferred under the parties' 2000 and 2002 agreements.  Dr. Davis opines that as a result of the improper GMAC holdbacks, TBW suffered economic harm through several channels, including the following:[3]

   a.   **Credit Quality Channel**: But for the improper holdbacks, Taylor Bean could have supported its loan production volume at a lower total cost of borrowing.  In particular, it could have applied the holdback amounts to pay down its borrowings (credit quantity) in the most cost-effective manner.

   b.   **Credit Price Channel**: Insofar as they led to a higher interest rate (credit price) on one or more of its borrowing facilities, the improper holdbacks caused additional harm to Taylor Bean.  In particular, by raising the price of credit, the improper holdbacks further raised the borrowing costs incurred by Taylor Bean to support its loan production volume.

GMAC moves to strike the expert testimony of Dr. Davis on two grounds.  First, GMAC argues that Dr. Davis' testimony regarding alleged damages due to the withholding of funds is solely based upon incidental and consequential damages, which are barred pursuant to the parties' agreements.  Second, GMAC contends that Dr. Davis' premise and methodology for calculating the alleged damages due to the withholding of funds is directly contradictory to TBW's business model and the express testimony of Plaintiff's CEO, Paul Allen.

---

[2] Because the Davis Report is marked "CONFIDENTIAL–ATTORNEY'S EYES ONLY", GMAC did not file the Report as an exhibit to the motion, but rather provided the Court with a courtesy copy.  The Court has reviewed this Report and contemporaneously with the docketing of this Order will direct the Clerk to file a copy of the Davis Report under seal.  Dr. Davis authored another expert report entitled "On Damages Relating To GMACM's Requests for Make-Whole Payments and Loan Repurchases."  However, this second report is not at issue in this motion.

[3] See Davis Report, page 10.  Dr. Davis also identified (1) personnel and management costs; (2) attorneys' fees and litigation costs; and (3) lost profits channel.  See id. at 10-11.

## II. DISCUSSION

As an initial matter, GMAC's arguments concerning Dr. Davis' testimony go more to the weight of the evidence, rather than the admissibility of the evidence under *Daubert*. However, because GMAC frames its motion as a Daubert motion, the Court will utilize the Daubert framework.

Under Federal Rule of Evidence 702, Daubert v. Merrell Dow Pharmaceuticals, Inc.,[4] and Kumho Tire Company Ltd., et al., v. Carmichael[5] expert testimony is admissible if (1) the expert is qualified to testify competently, (2) the expert has used sufficiently reliable methodology in reaching a conclusion, and (3) the testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.[6]

Among the factors that courts are to consider under the Daubert analysis are: (1) whether the expert's methodology has been tested, (2) whether the theory has been subjected to peer review and publication, (3) whether there are standards to guide the use of the technique, and (4) whether the theory or technique has been generally accepted in the scientific community.[7] These factors are illustrative and the trial court is granted considerable flexibility in adapting its analysis to fit a particular case.[8]

---

[4] 509 U.S. 579, 589, 113 S.Ct. 2786, 2794-95, 125 L.Ed.2d 469 (1993)

[5] 526 U.S. 137 (1999).

[6] City of Tuscaloosa v. Harcros Chem., Inc., 158 F.3d 548, 562 (11th Cir. 1998)(*citing* Daubert, 509 U.S. at 589.)

[7] Daubert, 509 U.S. at 593-94, 113 S.Ct. 2786.

[8] Kumho, 526 U.S. at 152, 119 S.Ct. at 1167.

Dr. Davis is the William H. Abbott Professor of International Business and Economics at the University of Chicago Graduate School of Business, where he has taught since 1986.[9] He has previously been a Visiting Associate Professor at the Massachusetts Institute of Technology, a Hoover Institution National Fellow at Stanford University and a Teaching Fellow at Brown University. Dr. Davis has taught university-level courses in money and banking, financial institutions and markets, microeconomics, macroeconomics and other subjects. Dr. Davis is also currently a Senior Consultant with CRA International, an economics, finance and business consulting firm. Prior to joining CRA International (from 1995 to 2006), Dr. Davis was a Principal at Chicago Partners, LLC, a consulting firm that specializes in economic and financial analyses. He has served as an expert reviewer for more than 30 scholarly journals in economics and related subjects and currently co-edits the *American Economic Journal: Macroeconomics*, published by the American Economic Association. Dr. Davis holds a bachelor's degree in economics from Portland State University and a Ph.D. and M.A. in economics from Brown University.

Based on these qualifications and achievements, GMAC does not challenge the qualifications of Dr. Davis as an expert in the field of economics. Therefore, the Court will not discuss the first prong of <u>Daubert</u> and concludes, for purposes of the <u>Daubert</u> analysis, that Dr. Davis is qualified to testify competently regarding the matters identified in the Davis Report.

---

[9] Dr. Davis' *curriculum vitae* is attached as Exhibit A to the Davis Report.

Having determined that Dr. Davis is competent to testify to the matters in his expert report, the Court must review the factors outlined in Daubert to determine whether Dr. Davis' opinions are reliable and relevant.

First, GMAC argues that Dr. Davis' opinions regarding the damages due to the withholding of funds are not relevant because they are based solely upon incidental and consequential damages. While GMAC has taken the position that incidental and consequential damages are barred by the parties' agreements, that is still a disputed issue in this case, and, as such, it does not provide a basis for excluding Dr. Davis' testimony.[10]

Moreover, there is sufficient evidence in the record to create a question of fact for the jury as to whether the damages identified by Dr. Davis as the "Credit Quantity Channel" are direct (as opposed to consequential) damages. Under Pennsylvania law, direct damages are those that are probably "within the contemplation of the parties."[11] The determination of whether damages are "within the contemplation of the parties" turns on whether the damages were foreseeable which is an issue of fact for the jury.[12]

---

[10] GMAC has filed a Motion For Partial Summary Judgment Regarding Damages (Doc. 114) in which it argues that consequential damages are barred by the parties' agreements.  In response (Doc. 127), TBW argues that under Pennsylvania law, bad faith in the formation and/or performance of a contract renders inoperable contractual provisions that purport to limit damages.  TBW further argues that there are disputed material facts as to whether GMAC was acting in bad faith in the formation and performance of the 2002 Agreement.  GMAC's motion remains pending.

[11] Sturtevant Co. V. York Card & Paper Co., 1917 WL 4881, *2 (Pa. Com.P. 1917)

[12] See Combustion Sys. Servs. v. Schuylkill Energy Resources, 1993 U.S. Dist. LEXIS 16374 (E.D. Pa. November 19, 1993)("characterization of a particular claim for damages as either direct or consequential is an issue of fact which is generally reserved for trial"); Krupp v. Lincoln Univ., 663 F.Supp. 289 (E.D. Pa. 1987)(citing Section 351 of the Second Restatement of Contracts, "Unforeseeability and Related Limitations on Damages"); (Seidel, Genoa & Goldhammer, P.C. v. Master Data Center, Inc., 438 F.Supp. 80 (E.D. Pa. 1977)(citing Restatement section addressing foreseeability of damages; applying Wisconsin law but cited with approval in Combustion Sys. Servs, which appears to apply Pennsylvania

(continued...)

Here, there is evidence in the record that the parties involved in negotiating the 2002 Purchase and Sale Agreement contemplated that the payment of the purchase price by GMAC for the servicing rights that it purchased would be used to pay down TBW's warehouse line (borrowings). Wes Howland, a Vice President of GMAC Mortgage, testified that he understood that TBW borrowed money to make loans, then sold those loans or the servicing rights and then used the money from the sale of the loans or servicing rights to reduce its warehouse line so that it could make more loans.[13] Sophie Schubert of GMAC Residential Funding Corporation ("RFC"), one of the lenders providing TBW with warehouse lines, called Barry Bier, an Executive Vice President of GMAC, and encouraged him to bid on the purchase of TBW's Fannie Mae servicing.[14] Ms. Schubert testified that she advised Mr. Bier that RFC had a first lien on the servicing that GMAC was purchasing so that she could be assured that when the purchase proceedings were made, RFC would get paid back.[15]  Additionally, Mr. Bier, as a Rule 30(b)(6) designee for GMAC, testified that those negotiating the 2002 Purchase and Sale Agreement understood that the creditors - RFC and Colonial Bank - would receive the proceeds from the sale.[16]  Moreover, the Funds Disbursement Agreement dated June 12, 2002 provided that the proceeds of the sale of the Fannie

---

[12](...continued)
law).

[13] See Doc. 270, Exhibit C (Howland Deposition) at 106-07.

[14]  See Doc. 270, Exhibit D (Schubert Deposition) at 83, 147 & 159.

[15] See id. at 159.

[16] See Doc. 270, Exhibit G (Bier Deposition) at 27-8.

Mae servicing rights would be wired directly to some of TBW's lenders.[17]  Lastly, the Guaranty Agreement between RFC and GMAC, acknowledged that RFC, as the Guarantor, had extended credit to TBW and would directly benefit from the 2002 Purchase and Sale Agreement by receiving a portion of the purchase price to satisfy TBW's indebtedness to it.[18]  Thus, while the evidence may be disputed as to whether TBW would have used the holdback funds to pay down its warehouse lines, there is evidence of record that supports this view and thus there is an evidentiary predicate for Dr. Davis' opinion.

Moreover, contrary to GMAC's suggestion, Dr Davis does not equate the damages from TBW's inability to pay down TBW's borrowing as "lost profits."  Dr. Davis states in his Report that TBW could apply the holdback funds to business expansion and at the same time apply those funds to reduce its borrowing.[19]  Dr. Davis explains that the most profitable use of the holdback funds might involve business expansion rather than the pay down of TBW's borrowings and in that case, his calculation of the portion of the economic harm from TBW's inability to pay down its borrowing would be less than lost profits – i.e., his "lower bound."[20]  Dr. Davis further clarified on deposition that damages calculated in the Credit Quantity Channel are not a form of lost profits:[21]

---

[17] See Doc. 270, Exhibit I.

[18] See Doc. 270, Exhibit E.

[19] See Davis Report at ¶28.

[20] See id.

[21] Doc. 270, Exhibit B (Davis Deposition) at 120-21.

> Just to make sure the record's clear on this point, the – because I think the term "lost profits" often has a specific meaning in damages matters, at least in my experience, that refers to the profits that might have been generated through the expansion of business activities, other – opportunities that were foregone because of the bad act of some party, and, in that sense, lost profits, is often associated with the idea that there's – that there are foregone business opportunities or paths we could have gone down in terms of expanding the business that we didn't undertake because of the bad acts, and, again, I want to emphasize, and I think I said this before, but it's worth reiterating, that the damages I calculated are predicated on the assumption that there was no expansion of Taylor Bean's loan production activity, that in the but-for world that I am conceiving of for the damage calculation it pursued exactly the same business activities that it actually did.

Because there is still an issue in the case of whether incidental and consequential damages are barred by the parties' agreement and since there is sufficient evidence in the record to create a question of fact for the jury as to whether the damages identified by Dr. Davis are direct (as opposed to consequential) damages, Dr. Davis' opinions regarding the damages due to the withholding of funds are certainly relevant to the issues in this case.

GMAC further argues that the Davis Report is not reliable because Dr. Davis' premise and methodology is directly contradictory to TBW's business model and the express testimony of Plaintiff's CEO, Paul Allen.   GMAC points to two pieces of evidence – (1) the opinion of GMAC's expert, Lester Alexander, that TBW's business model is based upon maximizing debt which in turn can be leveraged into income generating assets and profits;[22] and (2) the testimony of Paul Allen, TBW's CEO, that if TBW would have had access to the holdback funds, it would have used those funds to

---

[22] See Doc. 261, page 8.

expand its business and "close loans."[23]  Based on this evidence, GMAC contends that TBW would not have applied the holdback amounts to pay down its borrowings as Dr. Davis assumed but instead would have used the holdback funds to expand its business and close loans.

As discussed above, what TBW would have done with the holdback funds is a disputed factual issue in this case.  While GMAC points to evidence supporting its position that TBW would have used the funds to expand its business, as discussed above, there is also evidence supporting Dr. Davis' premise that TBW would have paid down its debt.  In addition, Lee Farkas, Chairman of TBW, testified that the holdback funds could have been used to lower the advance on the warehouse line, which would have allowed TBW to obtain a lower interest rate.[24]   After considering this disputed evidence, the jury will have to determine what weight to accord Dr. Davis' opinions.  Indeed, GMAC's arguments concerning Dr. Davis' expert report and his testimony go more to the weight of the evidence, rather than to the admissibility of the evidence under <u>Daubert</u>.  The Court need not determine that the expert testimony TBW seeks to offer into evidence is irrefutable or certainly correct.[25]  The certainty and correctness of Dr. Davis' opinion will be tested through cross-examination and presentation of contrary evidence and not by a <u>Daubert</u> challenge.

---

[23] <u>See</u> Doc. 261, Exhibit C, pages 297-99.

[24] <u>See</u> Doc. 270, Exhibit K (Farkas Deposition) at 307-09.

[25] <u>Westberry v. Gislaved Gummi AB</u>, 178 F.3d 257, 261 (4th Cir. 1999)

Accordingly, the Court concludes that the opinions to be offered by Dr. Davis are sufficiently reliable and relevant to the issues in the case and would assist the trier of fact and, as such, satisfy the second prong of the <u>Daubert</u> test.

### III. **CONCLUSION**

In view of the foregoing, Defendant GMAC Mortgage Corporation's Motion To Strike Expert Testimony Of Steven J. Davis And Disqualify Him From Testifying At Trial On Damages Due To The Withholding Of Funds (Doc. 261) is **DENIED**.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on August 6, 2008.

_____
GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel