UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

TAYLOR, BEAN & WHITAKER MORTGAGE
CORPORATION, a Florida corporation,

        Plaintiff,

v.                                    Case No.  5:05-cv-260-Oc-GRJ

GMAC MORTGAGE CORPORATION, a
Pennsylvania corporation,

        Defendant.

_____

## **ORDER**

Pending before the Court are: (1) Taylor Bean & Whitaker's Motion To Exclude Testimony Of Lester Alexander Due To Improper Reliance Upon Opinion Of Undisclosed Expert (Doc. 256), to which Defendant filed a response in opposition (Doc. 273); and (2) Taylor, Bean & Whitaker Mortgage Corporation's *Daubert* Motion To Exclude The Opinions Of Lester Alexander (Doc. 258), to which Defendant filed a response in opposition (Doc. 275).

For the reasons discussed below, Taylor Bean & Whitaker's Motion To Exclude Testimony Of Lester Alexander Due To Improper Reliance Upon Opinion Of Undisclosed Expert (Doc. 256) is due to be **DENIED** and Taylor, Bean & Whitaker Mortgage Corporation's *Daubert* Motion To Exclude The Opinions Of Lester Alexander (Doc. 258) is due to be **GRANTED** to the limited extent stated in the body of this Order and in all other respects is due to be **DENIED.**

## I.  INTRODUCTION

Plaintiff, Taylor, Bean & Whitaker Mortgage Corporation ("TBW") moves to exclude the opinions of Defendant, GMAC Mortgage Corporation's ("GMAC") expert, J. Lester Alexander, III.   At issue is Mr. Alexander's expert report entitled "Summary Report of Accounting, Economics and Appraisal Group, LLC" (hereinafter referred to as the "Alexander Report.")[1]  In his Report, Mr. Alexander opines *inter alia* that, in March of 2000, GMAC overpaid TBW for the mortgage servicing rights ("MSRs") that it purchased from TBW at that time because, had it known that TBW was unable to meet investor requirements, GMAC would have paid TBW approximately $20 million less.   In calculating these damages, Mr. Alexander utilized a formula that relied upon data from indices created by the Mortgage Industry Advisory Corporation ("MIAC".)

## II.  DISCUSSION

### A.    *Reliance Upon Opinion of Undisclosed Expert*

TBW argues that essential aspects of Mr. Alexander's opinion are the work  of another undisclosed expert  -- MIAC.  Accordingly, TBW contends that MIAC's opinion and Mr. Alexander's opinions, which rely heavily upon MIAC, must be excluded pursuant to Rule 37(c)(1).[2]

---

[1] The Alexander Report is attached as Exhibit 1 to TBW's instant motion (Doc. 258), and a revised version of the Alexander Report is attached as Exhibit 2.  There appears to be some dispute regarding the scope of Mr. Alexander's revised Report, however, such dispute is not before the Court.

[2] Rule 37(c)(1) "requires absolute compliance with Rule 26(a)," in that it "'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or substantially justified." Roberts ex rel. Johnson v. Galen of Virginia, Inc., 325 F.3d 776, 782 (6th Cir. 2003.)   Based on the Court's conclusion that GMAC was not required to disclose MIAC as an expert, the Court need not determine whether there was a discovery violation, and if so, whether the violation was harmless or substantially justified.

In calculating GMAC's alleged damages, Mr. Alexander relied upon the MIAC

mortgage servicing rights ("MSR") product type price indices.[3]  The Court is persuaded

that MIAC is not an expert that had to be disclosed, but rather a source of data that Mr.

Alexander relied upon in formulating his opinions and calculations.[4]   As an initial matter,

it has always been clear that Mr. Alexander's opinion relied upon the MIAC indices and

he has disclosed to TBW his calculations using this data.[5]   Moreover, there is no

suggestion that MIAC created its indices or generated any other data based upon the

specific details of this case; rather, Mr. Alexander relied upon the compilation of data

publicly provided by MIAC.[6]   That a representative of MIAC gave Mr. Alexander some

general guidance on the use of their indices, does not, in and of itself, make MIAC an

---

[3]  Doc. 273, Exhibit D (hereinafter "Alexander Affidavit") at ¶11(e)-(f).

[4] The MIAC indices seem akin to  the types of data upon which experts routinely have been permitted to rely pursuant to Rule 703, Federal Rules of Evidence.  See e.g., Higgins v. Kinnebrew Motors, Inc., 547 F.2d 1223, 1226 (5th Cir. 1977)(economics expert could properly rely on figures from Bureau of Labor Statistics rather than obtaining actual figures on expenses of decedent in calculating future damages); Mealey v. Slaton Mach. Sales, Inc., 508 F.2d 87 (5th Cir. 1975)(in calculating damages of loss of future earnings, economist could rely upon tables prepared by the United States Department of Labor and Bureau of Labor Statistics); Weiss v. Allstate Ins. Co., 512 F.Supp.2d 463, 477 (E.D. La. 2007)(damages expert properly relied upon the Accuweather report, a compilation of weather data compiled by third-parties, because the compilation is reasonably relied upon by experts in the field.)

[5]  Thus, the instant case can be distinguished from U.S. v. Batchelor-Robjohns, 2005 WL 1761429 (S.D. Fla. 2005) in which the expert prepared a report that included calculations and conclusions regarding income generating capacity but the plaintiff and expert refused to produce documentation supporting the calculations.  Here, Mr. Alexander has disclosed both the source of his data and his calculations.

[6]  Accordingly, the instant case is distinguishable from Dura Automotive Systems of Indiana, Inc. v. CTS Corp., 285 F.3d 609 (7th Cir. 2002) and Malletier v. Dooney & Bourke, Inc., 525 F.Supp.2d 558, (S.D.N.Y. 2007)  – in both cases the proffered expert's opinion relied upon another "expert", analyst or assistant  who performed tests or analyses using the specific facts of the case.   In Dura, the Seventh Circuit held that the expert's opinion improperly relied upon the expert opinions of his assistants who determined the type of groundwater modeling to use and then performed the modeling.  Likewise, in Malletier, the court disallowed an expert opinion where the opinion was based on a regression analysis conducted by another analyst.   Additionally,  Loeffel Steel Prod., Inc. v. Delta Brands, Inc., 387 F.Supp.2d 794 (N.D. Ill. 2005) is distinguishable.  In Loeffel, the Court excluded expert opinion that was based on a theory furnished by the defendant's employees in the midst of litigation and defendant made no attempt to demonstrate that the kind of information on which the expert relied was of the type normally relied on by experts in his field.

expert in this case.  Because the Court concludes that MIAC was a data source (and

not an undisclosed expert), it must now determine whether the MIAC indices were an

appropriate data source for Mr. Alexander to rely upon.

Pursuant to Rule 703, Fed.R.Evid., experts may rely upon the research, studies,

reports, and expertise of others, so long as they are of the sort of information relied

upon by experts in the field.[7]   In determining whether an expert based his opinion upon

relevant and reliable data, "deference ought to be accorded to the expert's view that

experts in his field reasonably rely on such sources of information."[8]

MIAC is a private company that develops software that values loans and

mortgage servicing rights ("MSR") and produces quarterly MSR price indices.[9]  Mr.

Alexander attests that MIAC is the "leading industry source for mortgage servicing asset

pricing data" and that MIAC "holds itself out as an authority in MSR pricing.[10]   Mr.

Alexander testified that MIAC is "regularly used by many public companies to value their

servicing rights."[11]   MIAC's website states that, "[n]ine of the ten largest mortgage

companies in the nation license MIAC Analytics today" and that in October 2006 "MIAC

was named the leading provider of Secondary and Residual Pricing in the Securitized

---

[7] See Eclipse Elecs. v. Chubb Corp., 176 F.Supp.2d 406, 412 (E.D. Pa. 2001); see also, Higgins v. Kinnebrew Motors, Inc., 547 F.2d 1223, 1226 (5th Cir. 1977)(economics expert could properly rely on figures from Bureau of Labor Statistics rather than obtaining actual figures on expenses of decedent in calculating future damages); Mealey v. Slaton Mach. Sales, Inc., 508 F.2d 87 (5th Cir. 1975)(in calculating damages of loss of future earnings, economist could rely upon tables prepared by the United States Department of Labor and Bureau of Labor Statistics.)

[8] Greenwood Utils Comm'n v. Mississippi Power Co., 751 F.2d 1484, 1495 (5th Cir. 1985)(citing In re Japanese Electronic Products, 723 F.2d 238, 277 (3rd Cir. 1983.)

[9] Doc. 275, Exhibit 3 (Cuoto Deposition) at pages 145-46.

[10] Alexander Affidavit at ¶11. In fact,

[11] Doc. 256, Exhibit B ("Alexander Deposition") at pages 141-42.

and Structured Finance markets by The Bond Market Association and The American

Securitization Forum." [12]   Moreover, Terry Cuoto, TBW's expert, acknowledged that

MIAC is the only entity publishing a MSR price index and in preparing his Report, Mr.

Cuoto relied upon an article that expressly provides that MIAC is an authority in the

industry with regard to "interest rate derivative pricing software and pricing services" for

MSRs.[13]   Accordingly, even considering Mr. Cuoto's testimony – that "mortgage

industry mortgage valuation professionals really don't use . . . those indices"[14] – there is

ample evidence in the record to support a finding that the MIAC indices are the type of

data reasonably relied upon by experts in the mortgage servicing industry.[15]

Because the indices were the type of data reasonably relied upon by experts in

the mortgage servicing industry, it was permissible for Mr. Alexander to rely upon that

data even though he does not understand every detail of how it was calculated.[16]

Indeed, "[u]nlike an ordinary witness, . . . an expert is permitted wide latitude to offer

---

[12] See  www.servicing.com.

[13] Doc. 256, Exhibit 4 (Cuoto Deposition) at 136-38; 143-44; Doc. 275, Exhibit 3 (Cuoto Deposition) at 147-48.

[14] Doc. 256, Exhibit 4 (Cuoto Deposition) at pages 142-43.

[15] That Mr. Alexander has never previously used the MIAC indices is not surprising.  As discussed below, Mr. Alexander is a very experienced accountant, without a specific background in the mortgage industry.  However, Mr. Alexander attests that he has significant experience making fair value determinations using quoted market-pricing data, such as the indices at issue here. See Alexander Affidavit at ¶11(d); see also, Loeffel Steel Products, Inc. v. Delta Brands, Inc., 387 F.Supp.2d 794, (N.D. Ill, 2005)(rejecting argument that in order to qualify as a damages expert, business appraiser must have specific experience with the type of machine at issue.)

[16] Contrary to TBW's suggestion, Mr. Alexander has information about MIAC's creation of the indices.  See e.g., Doc. 256, Exhibit 2 (Alexander Deposition), pages 130-31 & 141-47.  Moreover, Mr. Alexander produced supporting documentation that outlines how MIAC creates its indices.  See Doc. 275, Exhibits 8 & 9.

opinions, including those that are not based on firsthand knowledge or observation."[17]

Moreover, since Mr. Alexander timely disclosed his reliance on the MIAC data, TBW

had the opportunity to conduct its own research and analysis into the reliability of the

MIAC data and cross-examine Mr. Alexander regarding his reliance upon it.

Accordingly, for the reasons stated above, Taylor Bean & Whitaker's Motion To

Exclude Testimony Of Lester Alexander Due To Improper Reliance Upon Opinion Of

Undisclosed Expert (Doc. 256) is due to be **DENIED**.

## B.   *Daubert Motion*

Under Federal Rule of Evidence 702, Daubert v. Merrell Dow Pharmaceuticals,

Inc.,[18] and Kumho Tire Company Ltd., et al., v. Carmichael[19] expert testimony is

admissible if (1) the expert is qualified to testify competently, (2) the expert has used

sufficiently reliable methodology in reaching a conclusion, and (3) the testimony will

assist the trier of fact, through the application of scientific, technical, or specialized

expertise, to understand the evidence or to determine a fact in issue.[20]

Among the factors that courts are to consider under the Daubert analysis are: (1)

whether the expert's methodology has been tested, (2) whether the theory has been

subjected to peer review and publication, (3) whether there are standards to guide the

use of the technique, and (4) whether the theory or technique has been generally

---

[17] Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579, 592 (1993.)

[18] See id. at 589. (1993)

[19] 526 U.S. 137 (1999).

[20] City of Tuscaloosa v. Harcros Chem., Inc., 158 F.3d 548, 562 (11th Cir. 1998)(*citing* Daubert, 509 U.S. at 589.)

accepted in the scientific community.[21] These factors are illustrative and the trial court is

granted considerable flexibility in adapting its analysis to fit a particular case.[22]

Mr. Alexander is a Certified Public Accountant and a Certified Fraud Examiner

with more than twenty-nine years of professional experience performing audit, tax and

consulting services and has, in recent years, concentrated his practice in the areas of

valuation, forensic accounting, and fraud investigation consulting services.[23]   He is the

founder and Managing Principal of Accounting Economics and Appraisal Group, LLC

and he is a former partner of PricewaterhouseCoopers LLP and former southeastern

practice leader of one of its legacy firm's consulting practices.  Mr. Alexander holds a

Bachelor of Science in Accounting from the University of Alabama.

Based on these qualifications and achievements, TBW does not challenge the

qualifications of Mr. Alexander as an expert in the fields of accounting and economics.[24]

Therefore, the Court will not discuss the first prong of Daubert and concludes, for

purposes of the Daubert analysis, that Mr. Alexander is qualified to testify competently

regarding the matters identified in the Alexander Report.

---

[21] Daubert, 509 U.S. at 593-94, 113 S.Ct. 2786.

[22] Kumho, 526 U.S. at 152, 119 S.Ct. at 1167.

[23] Mr. Alexander's Resume is attached as Appendix 5 to the Alexander Report.  See also Alexander Affidavit at ¶¶ 2-3.

[24] While not specifically challenging Mr. Alexander's qualifications in its motion, TBW notes in a footnote that Mr. Alexander is not a mortgage or mortgage services rights valuation expert but an accountant and CPA who does valuations generally.  See Doc. 258 at 3, note 2; see also, Loeffel Steel Products, Inc. v. Delta Brands, Inc., 387 F.Supp.2d 794, 801-02 (N.D. Ill, 2005)(rejecting argument that in order to qualify as a damages expert, business appraiser must have specific experience with the specific industry and type of machine at issue.)

Having determined that Mr. Alexander is competent to testify to the matters in his expert report, the Court must review the factors outlined in <u>Daubert</u> to determine whether Mr. Alexander's opinions are reliable and relevant.

### *(1)   The Alexander Report is based on appropriate facts and data*

TBW argues that Mr. Alexander erroneously relied on MIAC-created indices in calculating GMAC's alleged overpayment, without knowing how MIAC creates its indices or what data went into them.   TBW further contends that because MIAC uses a proprietary "secret" method to create the indices, neither TBW nor the trier of fact can judge their appropriateness.

However, as discussed above,  the MIAC indices are the type of data reasonably relied upon by experts in the mortgage servicing industry.  While Mr. Alexander does not know every detail regarding the creation of these indices, he produced information about their creation and TBW has had ample opportunity to conduct its own research and analysis into the reliability of the MIAC data and cross-examine Mr. Alexander regarding his reliance upon it. [25]   Accordingly, for the reasons discussed above, the Court concludes that the Alexander Report is based on appropriate facts and data.

---

[25] TBW cites <u>SMS Systems Maintenance Services, Inc. v. Digital Equip. Corp.</u>, 188 F.3d 11, 25 (1st Cir. 1999) for the proposition that an expert must "vouchsafe the reliability of the data."  In <u>SMS Systems</u>, the expert based his conclusion on sources which he failed to attach or discuss.  The court found that "[n]ot only did Dr. Bleuel fail to discuss in his report the nature of the data and its meaning, but he failed to explain whether the information-gathering technique used in the DEC documents was valid, whether the data was sufficiently representative to permit him to draw any relevant conclusions, and whether the sampling methodology used to compile these documents corresponded to methods that might be considered legitimate in his discipline."  This is very different from the instant case, where the Court has found that the MIAC indices were the type of data reasonably relied upon by experts in the mortgage servicing industry.

### (2)    Mr. Alexander's opinion as to GMAC's alleged overpayment is the product of sufficiently reliable principles and methods

TBW argues that Mr. Alexander's formula for calculating GMAC's alleged overpayment is not sufficiently reliable.[26]  TBW points to its rebuttal expert, Terry Cuoto, who challenged Mr. Alexander's use of the MIAC indices and stated that Mr. Alexander's overall approach "was unique and something that [he has] never seen used before in the mortgage valuation profession."[27]

Mr. Alexander attests that he used the methodology of relative valuation to calculate GMAC's damages – i.e., comparison of the values of the MSRs bargained for to the values of the MSRs received by GMAC.[28]  Mr. Alexander testified that he has used this methodology frequently to calculate damages.[29] Moreover, while Mr. Alexander has never used this precise calculation in valuing mortgage servicing rights, he testified that he believes that he has "used the logic which is displayed by the formula many times in valuing various contract rights."[30]

Simply because the experts disagree as to the most reliable method for calculating damages does not require the exclusion of Mr. Alexander's opinion.  Such

---

[26]  Mr. Alexander's formula which illustrates his process can be found in the notes at the bottom of page 4 of Appendix 3 of the Alexander Report. Mr. Alexander calculated damages  by determining a "discount" percentage that he believes represents the percentage of overpayment by GMAC.  His formula defined overpayment as the difference between "market conforming" and "nonconforming," and then divided the difference by what Mr. Alexander calls "actual."  For "market-conforming", Mr. Alexander testified that he used agency multiples (i.e., multiples for non-jumbo loans that meet the requirements of Fannie Mae or Freddie Mac) that came from MIAC.  For "nonconforming," Mr. Alexander testified that he used MIAC multiples for jumbo loans.

[27] Doc. 258, Exhibit 5 (Cuoto Report).

[28] Alexander Affidavit at ¶12.

[29] Alexander Deposition at 116.

[30] Alexander Deposition at 119.

arguments go more to the weight of the evidence, than the admissibility of the evidence under Daubert.  The certainty and correctness of Mr. Alexander's opinion will be tested through cross-examination and presentation of contrary evidence and not by a Daubert challenge.

### *(3)   Mr. Alexander reliably applied his principles and methods*

TBW argues that Mr. Alexander fails to reliably apply his principles and methods to the facts of this case.  First, TBW contends that the MIAC indices include a disclaimer that the indices do not represent multiples indicative of new production and should not be used to price such products.   However, Mr. Alexander relies on MIAC indices from 2000 through 2002 and they contain no such disclaimer.   The disclaimer was applicable only for the periods of April 2004 through November 2006.[31] Accordingly, TBW's first argument is without merit.

TBW also argues that Mr. Alexander should have used MIAC indices closest to the date of the signing of the 2000 Flow Agreement, as opposed to using MIAC indices that were closest to the transfer date of the MSRs under the 2000 Flow Agreement. GMAC contends that this argument is flawed because it would require Mr. Alexander to calculate damages on an asset before the asset ever existed and before any harm resulted.  GMAC contends that this would be less reliable and correct asset valuation requires Mr. Alexander to value the asset (or MSRs) when it was created and received. Additionally, TBW contends that Mr. Alexander improperly used the MIAC-created index representing multiples for jumbo loans as a proxy for non-jumbo loans that are non-

---

[31] Alexander Affidavit at ¶13(f)-(g).

conforming to Fannie Mae or Freddie Mac guidelines.  Mr. Alexander explained that he

used the multiple for jumbo loans as a very conservative proxy.[32]    While the parties

disagree as to which indices should have been used, such disputes do not provide a

basis for excluding Mr. Alexander's opinion.

Indeed, these arguments go more to the weight of the evidence, than the

admissibility of the evidence under Daubert.  The Court need not determine that the

expert testimony GMAC seeks to offer into evidence is irrefutable or certainly correct.[33]

The certainty and correctness of Mr. Alexander's opinion will be tested through cross-

examination and presentation of contrary evidence and not by a Daubert challenge.

Indeed the Court's role as gatekeeper is not intended to supplant the adversary system

or the role of the jury: "[v]igorous cross-examination, presentation of contrary evidence,

and careful instruction on the burden of proof are the traditional and appropriate means

of attacking shaky but admissible evidence."[34]

### (4)    Mr. Alexander's opinion that TBW lacked the capability to meet investor guidelines should be excluded

TBW argues that Mr. Alexander's opinions regarding TBW's capabilities to meet

investor requirements should be stricken because Mr. Alexander did not apply any

analysis and his opinions are not the product of scientific, technical or other specialized

knowledge that will assist the trier of fact. Specifically, Mr. Alexander stated in his

Report that "TBW lacked capabilities to support its rapid growth and effectively originate

---

[32] Alexander Affidavit at ¶12(a).

[33]  Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999)

[34] Allison v. McGhan Medical Corp., 184 F.3d 1300, 1311-12 (11th Cir. 1999)(quoting Daubert, 509 U.S. at 596.).

and service loans during the time the agreements were executed with GMAC" and "TBW"'s lack of capabilities resulting in loan processing and risk management breakdowns, harming the quality of the loans originated under the agreements."[35]

It is unclear from Mr. Alexander's Report whether he truly is offering an opinion regarding TBW's *capabilities* to meet investor requirements or is simply commenting upon TBW's failure to meet investor requirements.  While he identifies a number of instances of "breakdowns" in loan processing and risk management capabilities,[36] there is no analysis, discussion or factual predicate for an opinion that TBW lacked the *capabilities* to meet investor requirements.[37]  Accordingly, to the extent TBW is requesting that Mr. Alexander not be permitted to opine on TBW's capabilities to meet investor requirements, that request is due to be **GRANTED**.  Mr. Alexander is entitled, however, to offer his opinion as to the damages suffered by GMAC from TBW's alleged failure to meet investor requirements.

Accordingly, for the reasons stated above, Taylor, Bean & Whitaker Mortgage Corporation's *Daubert* Motion To Exclude The Opinions Of Lester Alexander (Doc. 258) is due to be **GRANTED** to the limited extent stated above and otherwise **DENIED.**

---

[35] Alexander Report at ¶12.

[36] Mr. Alexander includes the following examples: (1) investor repurchase requests were not timely honored; (2) loans were lacking mortgage insurance; (3) loans were lacking proper appraisals as required by investors; (4) loans had improperly performed appraisals that generated inaccurate loan-to-value rations; (5) borrowers' employment and incomes were not verified as required by investors; and (6) TBW failed to verify asset documentation, accepted false documentation, originated mortgage loans without collateral and for non-existent properties, and failed to meet other investor guidelines. See Alexander Report, ¶13.

[37] For example, Mr. Alexander does not state that TBW lacked adequate technology or staffing  to meet investor requirements. More importantly there is no suggestion that Alexander examined the operations of TBW to render an opinion with regard to the capabilities (or lack thereof) of TBW.

### III.  CONCLUSION

In view of the foregoing,  Taylor Bean & Whitaker's Motion To Exclude Testimony Of Lester Alexander Due To Improper Reliance Upon Opinion Of Undisclosed Expert (Doc. 256) is **DENIED** and Taylor, Bean & Whitaker Mortgage Corporation's *Daubert* Motion To Exclude The Opinions Of Lester Alexander (Doc. 258) is **GRANTED** to the limited extent stated in the body of this Order and in all other respects is **DENIED**.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on August 12, 2008.

_____
GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel